WM. A. SMITH CONTRACTING CO., Inc., a corporation, and Wm. A. Smith Contracting Company of California, a corporation, doing business as a joint venture under the name of Lookout Point Constructors, Appellants,

v.

Marland CURTIS, Lyman Curtis, Glen C. Curtis and Rachel Curtis, a copartnership, doing business as Curtis Gravel Company, Appellees.

**No. 15828.**

United States Court of Appeals
Ninth Circuit.

Sept. 8, 1958.

Keane & Haessler, Gordon H. Keane, Eric R. Haessler, Virginia M. Riley, Portland, Or., for appellant.

Ramacciotti & Ratcliffe, Albert L. Ramacciotti, Robert E. Ratcliffe, Portland, Or., for appellees.

1

Before DENMAN, BARNES and HAMLIN, Circuit Judges.

DENMAN, Circuit Judge.

■ Lookout Point Constructors, two corporations, one of Missouri and the other of California (hereafter Constructors), appeal from a judgment for damages for breach of a contract to purchase ballast material for a railway track of some sixteen miles being constructed in Oregon by Constructors. The judgment was entered by the United States District Court of Oregon in a diversity action brought by Curtis Gravel Company, a partnership of Washington State citizens (hereafter Gravel Company).

Constructors contend that there is not sufficient evidence to support the District Court's finding that Gravel Company adequately performed its contract to supply the gravel. They contend further that the District Court erred in including certain interest charges in its judgment.

Constructors were under contract with the United States to construct the railroad and made its subcontract with Gravel Company as an independent contractor to furnish all the ballast material required, stockpiling it alongside the road and placing it on Constructors' cars. The contract provided that Gravel Company agreed to begin stockpiling May 1, 1951 and to complete it by October 11, 1951.

Gravel Company began producing ballast in late August, 1951, and could have completed the job by October. However, due to delays of other contractors working on related sections of the project, Constructors were unable to determine their requirements until May, 1952. Prior to the October, 1951, completion date, Gravel Company made several requests of Constructors for a final determination of its requirements. Constructors were unable to compute their final requirements at that time but promised to do so as soon as possible.

Having produced and stockpiled 58,434 yards of ballast for which the agreed price was $128,554.80 and receiving no estimate of any further requirements, in late February, 1952, Gravel Company dismantled and moved out its rock-crushing plant.

Constructors were subsequently forced to purchase an additional 12,800 cubic yards from commercial sources in order to complete their general contract. The difference between the subcontract price of ballast material and the higher commercial price paid for the additional ballast was $9,872.70. Constructors deducted that amount from their final payment to Gravel Company, claiming that the contract required Gravel Company to correctly estimate the total amount of ballast for building the railroad and to furnish it and continue its loading on Constructors' cars until the road was built.

This is the major question in the appeal. We think the District Court did not err in its finding that "* * * it was the intention, agreement and understanding of these parties that [Constructors] furnish [Gravel Company] with information as to final quantity requirements of ballast material within the time contemplated in the subcontract agreement."

It is obvious that Constructors, engaged in building railways, having surveyed the variations of grade of the sixteen miles of road with differences of excavations and fills and distances between the rails to be filled by the gravel, and knowing the quality of the bed on which the gravel would rest, were required to advise the Gravel Company of the total ballast needed between May and October 11, 1951.

Constructors did not begin their laying of rails from which they could have determined their requirement for ballast until April, 1952. We regard the Constructors as having breached their contract and the Gravel Company free to discontinue stockpiling.

Constructors' own statement that Gravel Company was entitled so to discontinue their work appears in a letter from their president to the Army Engineers, reading:

"Although I have no reason * * * for not having secured your permission to remove this equipment from the job site at the same time I believe it was self-evident to the Resident Engineer and to us that no one could afford to hold a complete quarrying and crushing plant for an indefinite duration to manufacture an indefinite quantity of material."

"That was in your mind at the time you wrote this letter?

"A. I think it's very clear in the letter that I wrote Curtis Gravel Company that I had no reason to ask them to hold the plant. I stated that quite clearly, that their means of procurement——".

The portion of the judgment for $9,867.87 plus interest thereon from December 17, 1952, is affirmed.

 The prime contract between the Constructors and the United States Government was altered, extended, and changed during the course of construction, and by reason of such changes, Gravel Company was called upon to furnish stand-by equipment, perform extra services and furnish extra materials outside the scope of the subcontract agreement of these parties. The reasonable value of said services and materials was $14,582.92.

Constructors, acting for Gravel Company, presented a claim to the United States Government, through the Corps of Engineers, for payment on account the extra services and material furnished by Gravel Company as aforesaid, and the claim was approved and allowed. On April 1, 1953 Constructors received payment in the sum of $14,582.92 from the United States Corps of Engineers on account of this claim for extra services and materials furnished by Gravel Company.

The District Court held the reasonable value of Constructors' services for administrative expense in presenting the aforesaid claim to the United States Government is a sum equal to 5% of the award, to-wit: $729.14, together with an additional sum equal to 1% of the award for bond expense, to-wit: $145.83 and that Gravel Company was entitled to a judgment for $14,582.92 less these amounts.

Constructors do not question that the judgment for this net amount is valid but claim that no interest was allowable thereon, since the net amount was in doubt and interest should not run until the exact amount was determined. It appears, however, that Constructors did not notify Gravel Company they had recovered the total amount for it and that if they had, the incidental expenses could have been agreed on at once. Instead, Constructors kept the Gravel Company's money for their own use and are in no position to contend that the interest should not be allowed from the date they received it.

The judgment is affirmed.